# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

HANES CARIBE, INC.,                    )
                                       )
                    Plaintiff,         )
          v.                           )          1:15CV972
                                       )
GLOBAL MANUFACTURERS AND               )
CONTRACTORS, S.A.,                     )
                                       )
                    Defendant.         )

## MEMORANDUM OPINION AND ORDER

Before the Court are four motions – Plaintiff's Motion for Preliminary

Injunction Barring Defendant from Pursuing Haitian Proceeding in Contravention of

Arbitration Agreement ("Motion for Preliminary Injunction") [Doc. #3]; Defendant's

Motion for Dismissal Pursuant to Federal Rules of Civil Procedure 12(b)(2) and

12(b)(3), or Alternatively, for Dismissal or Stay Pursuant to the "First-Filed Action"

Doctrine ("Motion to Dismiss") [Doc. #17]; Plaintiff's Alternative Motion for

Expedited, Limited Discovery Regarding Personal Jurisdiction ("Motion for

Discovery") [Doc. #27]; and Plaintiff's Emergency Motion to Expedite Hearing and

Decision on Pending Motions ("Emergency Motion") [Doc. #36].  Before the Court

could issue this Memorandum Opinion and Order, but after it had determined that it

lacks personal jurisdiction over Global Manufacturers and Contractors, S.A.

("GMC"), Hanes Caribe, Inc. ("Hanes Caribe") filed its Emergency Motion.  In

response to that motion, the Court issued an Order dated May 26, 2016 in which

it denied Hanes Caribe's preliminary relief due to the Court's lack of personal

jurisdiction over GMC and informed the parties that a Memorandum Opinion would be forthcoming. For the reasons explained below, GMC's Motion to Dismiss is granted in so far as this Court lacks personal jurisdiction over GMC, Hanes Caribe's Motion for Discovery is denied, Hanes Caribe's Motion for Preliminary Injunction is denied for lack of personal jurisdiction over GMC, and Hanes Caribe's Emergency Motion is denied in part for lack of personal jurisdiction over GMC and in part as moot.

I.

The underlying action is one for a declaratory judgment and an anti-foreign suit injunction. Hanes Caribe, a corporation organized under the laws of the Cayman Islands with its principal place of business in George Town, Cayman Islands, is a wholly-owned subsidiary of Hanesbrands Inc. ("Hanesbrands"), a manufacturer and marketer of basic apparel that has its principal place of business in Winston-Salem, North Carolina. (Compl. ¶¶ 4, 8 [Doc. #1].) Hanes Caribe is the assignee of Hanes Dominican, Inc. ("Hanes Dominican"), another wholly-owned subsidiary of Hanesbrands organized and operating in the Cayman Islands.[1] (Id. ¶ 5.) Hanes Dominican entered into an Amended and Restated Manufacturing Services Agreement on September 1, 2008 (together with amendments "2008 Agreement" and sometimes referred to as the "Agreement") with GMC, a corporation in the business of providing manufacturing services, including those

_____

[1] Hanes Dominican and Hanes Caribe entered into an Assignment and Assumption Agreement dated July 30, 2009. (Compl. ¶ 17, Ex. C.)

2

related to apparel, organized under the laws of Haiti with its principal place of business in Port-au-Prince, Haiti. (Id. ¶¶ 6, 9, 10.)  Pursuant to the 2008 Agreement, beginning nunc pro tunc January 1, 2007 and ending December 31, 2013[2], GMC manufactured undergarments for Hanes Dominican and subsequently for Hanes Caribe. (Id. ¶ 12; id. Ex. A [Doc. #1-1].)  Section 15 of the 2008 Agreement provides, in relevant part, that "[a]ll disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce[,]" the "place of the arbitration shall be Miami, Florida," and the "contract shall be governed by North Carolina law, without regard to any conflict of law or arbitration rules." (Id. ¶¶ 14, 15.)

In September 2015, GMC filed suit in Haiti against Hanes Dominican[3] to recover compensation that it believes it is owed pursuant to the Standard Allowed Minute provision in the 2008 Agreement. (Id. ¶¶ 20-22, Ex. D.)  In the instant action, Hanes Caribe alleges that, by filing suit in Haiti, GMC breached the 2008 Agreement by disregarding "the clear and binding language of Section 15 of the 2008 Agreement" and attempted "to avoid the agreed-upon arbitration[.]" (Id. ¶¶

_____

[2] The parties agree that the 2008 Agreement expired on December 31, 2013 after several amendments. (Pl.'s Resp. to Def.'s Mot. to Dismiss at 5 [Doc. #23]; Decl. of André Apaid ¶ 16 [Doc. #33].)  After the expiration of the Agreement, GMC and Hanes Caribe continued to do business. (Decl. of André Apaid ¶ 16.)
[3] According to Hanes Caribe, GMC "knows or should have known that Hanes Caribe is the proper defendant in the Haitian action." (Pl.'s Mem. of Law in Supp. of Mot. for Prelim. Inj. Barring Def. from Pursuing Haitian Proceeding in Contravention of Arbitration Agreement at 6 [Doc. #6].)

25, 26.)  Therefore, Hanes Caribe asks this Court to declare the arbitration clause in the 2008 Agreement valid, enforceable, and applicable to GMC's claims contained in the Haitian complaint and to enjoin GMC from pursuing the Haitian proceeding. (Id. ¶¶ 27-40.)

In the Complaint, Hanes Caribe alleges that:

> The Defendant, GMC, is subject to personal jurisdiction in North Carolina pursuant to North Carolina's long-arm statute, N.C. Gen. Stat. § 1-75.4, because GMC is engaged in substantial activity in North Carolina by doing business with Hanes Caribe, which is a wholly-owned subsidiary of Hanesbrands Inc. ("Hanesbrands"), related to the underlying agreements and dispute between the parties. Hanesbrands Inc. has its principal place of business in Winston-Salem, North Carolina.

(Id. ¶ 2.)

When Hanes Caribe filed its Complaint, it also filed its Motion for Preliminary Injunction.  In response, GMC filed a motion, in part to dismiss for lack of personal jurisdiction "on the grounds that the location of Hanes Caribe's parent corporation does not confer jurisdiction over GMC in this Court." (Mot. to Dismiss at 1.) Hanes Caribe responded in opposition to GMC's Motion to Dismiss and filed its Motion for Discovery.  Because the Court may only address Hanes Caribe's Motion for Preliminary Injunction if it has personal jurisdiction over GMC, GMC's challenge to personal jurisdiction will be addressed first.

At its foundation, Hanes Caribe's argument that this Court has personal jurisdiction over GMC is that GMC, a Haitian corporation, purposefully availed itself of the privilege of doing business in North Carolina when it entered into a contract

with Hanes Dominican and later its assignee Hanes Caribe, both Cayman Island corporations, to perform work in Haiti and to submit to arbitration in Florida for disputes arising out of the contract. The crux of GMC's alleged connection to North Carolina is its relationship with Hanesbrands, a company with its principal place of business in North Carolina, but with whom GMC has never entered into a contract, who is not a party to the contract at dispute here, and who is not a party to the underlying action before the Court.

## II.

According to André Apaid of GMC[4], GMC's sole place of business is Port-au-Prince, Haiti, and it has no property, bank accounts, or employees in North Carolina, (Decl. of André Apaid ¶¶ 4-7), and Hanes Caribe does not contend otherwise. In the 1990's, Hanes Dominican executives contacted Apaid and his wife, who were living in the Dominican Republic, and asked them to move to Haiti to start manufacturing operations exclusively for Hanes Dominican. (Id. ¶ 8.a.) Over the course of the relationship with Hanes Dominican, GMC and Hanes Dominican entered into a number of contracts, (see Decl. of Javier Chacon ¶ 5; Decl. of André Apaid ¶¶ 8-9); however, GMC never entered into any contracts with Hanesbrands, (Decl. of André Apaid ¶ 17).

---

[4] Javier Chacon, Chief Global Manufacturing Operations Officer at Hanesbrands, asserts that André Apaid is the President of GMC. (See Decl. of Javier Chacon ¶¶ 2, 3 [Doc. #24].) However, Apaid states that he is the attorney-in-fact for President of GMC Elisabeth Apaid. (Decl. of André Apaid ¶ 2.)

Javier Chacon, the Chief Global Manufacturing Operations Officer at Hanesbrands, asserts that "at multiple times throughout this long-term business relationship, GMC's representatives negotiated the contractual terms of the parties' relationship directly with at least Michael Faircloth, Gerald Evans, [Chacon], and other Hanesbrands decision-makers in Winston-Salem." (Decl. Javier Chacon ¶ 14.)  However, the only evidence of the negotiations specific to the 2008 Agreement, the contract that forms the basis of this underlying action, comes from GMC.[5]  Apaid asserts that he negotiated the contract with the contractor managers and the country managers of Hanes Dominican based in the Dominican Republic, and that negotiations between the parties took place in Haiti and the Dominican Republic. (Decl. of André Apaid ¶¶ 10.a., 10.b.)  The 2008 Agreement was signed by Gerald Evans[6] and Catherine Meeker, as President and Vice President respectively of Hanes Dominican, and André Apaid as President of GMC. (Compl. Ex. A at 25-26.)  Likewise, the only evidence specific to the negotiations for the 2009 Amendment No. 1 to the 2008 Agreement is from GMC.  Apaid's contact person for the amendment was the contractor manager of Hanes Dominican based

_____

[5] Hanes Caribe has even moved for limited jurisdictional discovery on, among other topics, the contract negotiations between Hanes Caribe, Hanesbrands, and GMC and the location where any agreements were entered into (see Pl.'s Alternative Mot. for Expedited, Limited Disc. Regarding Personal Jurisdiction at 2-3 Doc. #27]), information that should be within Hanes Caribe's knowledge.

[6] Chacon asserts in his declaration that, at least as of the time of his declaration, Evans is Chief Operating Officer of Hanesbrands. (Decl. of Javier Chacon ¶ 9.) There is no information before the Court to explain if Evans served both roles when he signed the 2008 Agreement on behalf of Hanes Dominican or if he was transferred to Hanesbrands sometime after the 2008 Agreement was executed.

in the Dominican Republic, and negotiations took place in Haiti and the Dominican Republic. (Decl. of André Apaid ¶¶ 11, 11.a., 11.b.)  Similarly, when Hanes Dominican assigned its rights and obligations to Hanes Caribe in 2009, Apaid's contact persons were contract managers for Hanes Caribe based in the Dominican Republic. (Id. ¶¶ 12, 13; see also Compl. Ex. B, Letter from Catherine A. Meeker, as V.P. & Sec'y of Hanes Dominican, Inc. and Hanes Caribe, Inc. to GMC (July 30, 2009).)  Other than Chacon's previously described general statement about the entirety of the decades' long relationship, Hanes Caribe offers no evidence to the contrary.  The same is true for Apaid's assertion that the last of the amendments to the 2008 Agreement, in November 2012, was signed by Ricardo Perez of Hanes Caribe who was based in the Dominican Republic. (Decl. of André Apaid ¶ 15.)

The 2008 Agreement, which Hanes Caribe attached in support of its Complaint and upon which it relies in its brief in opposition to GMC's Motion to Dismiss, provides in part that Hanes Dominican[7] was to retain title to, but consign and arrange to have shipped directly to GMC's facility in Port-au-Prince, Haiti cut parts, trims, threads, labels, packaging supplies, inspection labels, and inspection stickers. (Compl. Ex. A at § 2.A.)  Hanes Dominican was to ship these parts in quantities sufficient for GMC to sew, package, inspect, and ship the products in accordance with Hanes Dominican's monthly forecast of needs. (Id.)  GMC agreed

---

[7] Because the 2008 Agreement was entered into by Hanes Dominican and GMC, the terms of the Agreement described here will refer to Hanes Dominican. However, after the 2009 assignment, the rights and obligations of Hanes Dominican under the Agreement became those of Hanes Caribe.

7

to assemble the parts in strict conformity to the assembly requirements and procedures detailed in Hanes Dominican's specification guidelines and to invoice Hanes Dominican using an invoice conforming to requirements communicated by Hanes Dominican. (Id.)  GMC also agreed to advise Hanes Dominican in writing of receipts of parts and finished product shipments. (Id. § 11.C.)

All products that GMC assembled were for destination to and shipment to the United States, and all invoices were to be endorsed, "This merchandise is sold for exportation to the U.S.A.". (Id. § 2.B.)  The product was to be shipped at Hanes Dominican's expense from GMC's facility in Haiti to the export location designated by Hanes Dominican by such carrier or carriers also designated by Hanes Dominican. (Id. § 9; see also id. App. C (providing additional specifications and quality terms and referring to shipping to Hanes Dominican or Hanes Dominican's ultimate customer as directed and communicated by Hanes Dominican).)  GMC agreed to respond to all reasonable requests of Hanes Dominican or the United States Customs Services in connection with Hanes Dominican's efforts to export and secure favorable tariff and quota treatment for the product. (Id. § 27.)

It was GMC's responsibility to inspect each shipment prior to the product leaving GMC's premises. (Id. § 10.B.)  Likewise, GMC agreed to ensure (as opposed to "insure"[8]), and bear the costs of ensuring, the security of all shipments

---

[8] See § 12 of the 2008 Agreement where GMC was required to procure, maintain, and keep in full force and effect insurance coverage.

of product from the time they left GMC's premises until loaded onto the final outbound transporting carrier. (Id. § 10.A.)  Security measures were to include departure from GMC's premises, records from and participants in the inspection and sealing procedures, and routing to the outbound carrier. (Id.)  However, Hanes Dominican agreed to arrange for and provide at its sole cost and expense insurance for parts and product in transit after the shipment crossed the continental shelf, just outside the United States territorial waters through GMC's facility until the product reached the point just prior to the United States continental shelf. (Id. § 12.)

The parties agreed that "[a]ll disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce" in Miami, Florida with North Carolina law governing. (Id. §§ 15, 15.A., 15.D.)  All notices to Hanes Dominican's corporate office were to be sent to the Cayman Islands; all notices to Hanes Dominican's facility were to be sent to the Dominican Republic; and all notices to the "Law Department" were to be sent to Winston-Salem, North Carolina. (Id. § 36.)  All notices to GMC were to be sent to Haiti. (Id.)

The 2008 Agreement does refer to Hanesbrands periodically.  GMC was required to follow the "HBI Childrenswear Product Safety Manual" (id. § 5), "HBI's Global Business Standards" and "Global Standards for Suppliers" (id. § 18.A.), "HBI Quality Goals" (id. App. B), and the "Broken Needle Policy & Procedure" (id. App. F).  GMC was also prohibited from violating any of Hanesbrands' intellectual

9

property rights. (Id. § 13.) Copies of all reports, documents, and forms faxed to Hanesbrands were to be faxed simultaneously to Hanes Dominican. (Id. § 11.C.)

Consistent with the aforementioned contract terms, Apaid contends that GMC delivered all finished products to Hanes Dominican or Hanes Caribe in Haiti, and those entities chose the shipping destinations and carriers and arranged and paid for the contracts of carriage. (Decl. of André Apaid ¶ 22.) According to Apaid, terms of delivery were "FOB" Haitian Plant, and possession and risk of loss passed to Hanes Dominican or Hanes Caribe at the point of delivery at GMC's Haitian facilities. (Id.)

According to Chacon, though, "GMC has manufactured tens of millions of units of T-shirts, worth hundreds of millions of dollars[9], on a continuous basis throughout the parties' long-term relationship[,] . . . the vast majority of [which] each year were delivered from GMC to Hanesbrands' facilities in North Carolina." (Decl. of Javier Chacon ¶ 7.) Attached to Chacon's declaration are invoices dated August 20, 2003, March 9, 2004, January 3, 2005, December 4, 2006, July 2, 2007, March 5, 2008, July 25, 2009, October 2, 2010[10], May 12, 2011, January 14, 2012, August 31, 2013, May 3, 2014, and November 28, 2015. (Decl. of

---

[9] The invoices and Hanesbrands' records reflect both a "value or invoice price" and a "total appraised value[,]" the former figure being much less than the latter. (See Decl. of Javier Chacon, Ex. A.) Chacon does not specify to which figure he is referring, but, upon review of other materials that Hanes Caribe submitted (see Decl. Kathryn Bullings [Doc. #25]), it is likely Chacon is referring to the appraised value.

[10] The copy of this invoice attached to Chacon's declaration is not clear, and, therefore, some figures are difficult to determine.

Javier Chacon, Ex. A [Doc. #24-1].) Among other information, the invoices list "Total Dozens", "Total Appraised Value", and "Total Invoice Value". (Id.) The invoices that would have been issued pursuant to the 2008 Agreement – July 2007, March 2008, July 2009, October 2010, May 2011, January 2012, and August 2013 – reflect that over 200,000 units were destined for North Carolina with an appraised value of over $250,000 (but an invoice value of over $30,000).[11] Each one notes that GMC (or its predecessor) was the party submitting the invoice, and, as of December 4, 2006, all invoices note GMC as the manufacturer. (Id.) The invoices issued from August 31, 2013 onward specifically reflect that GMC is the shipper. (Id.) Each invoice also lists the final destination as Hanesbrands (or its predecessor) in Winston-Salem or Rural Hall, North Carolina and the bill-to entity as Hanes Dominican or Hanes Caribe. (Id.)

Kathryn Bullings, Operations Account Manager at Hanesbrands, submitted a declaration to which Hanes Caribe attached Excel spreadsheets "showing the total number of goods shipped to North Carolina by [GMC]" between January 2008 and the end of 2015. (Decl. of Kathryn Bullings ¶ 3, Exs. A, B, C [Doc. #25].) According to Bullings, over that course of time, GMC shipped approximately 91,804,908 units "worth" approximately $132,399,803. (Id. ¶¶ 3, 4, 5.) Bullings states that, as shown in the attached spreadsheets, between January 2008 and December 31, 2013, GMC shipped more than 72 million units "worth"

---

[11] For explanation of why only the figures from invoices issued pursuant to the 2008 Agreement are detailed here, see infra 25-26.

$99,820,082 to North Carolina. (Id. ¶ 3).  Bullings' spreadsheets list GMC and its address in Haiti as the "From Plant Name", "From Address", "From City", and "From Country". (Id. Exs. A, B, C.)  Hanesbrands' Winston-Salem and Rural Hall addresses are listed as the "To Plant Name", "To address", "To City", and "To State". (Id. Exs. A, B, C.)  In addition, Denise Basden, Senior Finance Manager at Hanes Caribe, asserts that since at least 2003, "GMC and/or its predecessor shipped large amounts of goods to North Carolina on a regular, frequent basis year-after-year pursuant to its long[-]standing contractual relationship with Hanes Dominican and, subsequently, Hanes Caribe." (Decl. of Denise Basden ¶ 4 [Doc. #26].)  More specifically, she states that there were various sized "shipments of goods" from GMC to Hanesbrands in North Carolina in 2003, 2004, 2005, 2006, and 2007. (Id. ¶ 5.)   In 2007, the only one of these years that GMC would have shipped goods pursuant to the 2008 Agreement, there were at least 183 shipments of goods. (Id.)  However, because Basden does not define "shipments of goods", it is unclear how these figures compare to those that Bullings provided.

In addition to asserting that Hanes Caribe shipped large quantities of goods worth hundreds of millions of dollars to Hanesbrands in North Carolina, Chacon also asserts that various aspects of the parties' business relationship were carried out in North Carolina.  "[T]hroughout the entire relationship with GMC, all major planning, strategy and decisions for the relationship (including pricing) were made and approved in Hanesbrands' corporate offices in Winston-Salem, and communicated to GMC." (Decl. of Javier Chacon ¶ 8; see also id. ("These

12

strategies and decisions were made and communicated by" Hanesbrands.).)  More

specifically, the "contractual terms and pricing/payment decisions that are at [sic]

the subject of GMC's Haitian Action were decided and approved in Winston-

Salem[.]" (Id. ¶ 10.)  Employees in North Carolina also decided when to have GMC

interrupt and temporarily stop operations and when to enter into, continue, expand,

or terminate the relationship with GMC. (Id. ¶¶ 11, 12.)  They approved GMC's

invoices and wired funds to a GMC bank account in the United States on a weekly

basis. (Id. ¶ 27.)  Employees in North Carolina also coordinated with GMC in 2011

regarding an audit conducted of GMC's facility and plans to address concerns

raised in the audit. (Id. ¶ 20; see also Letter from Kim McAleer of Hanesbrands to

Andy Apaid of GMC (June 28, 2011) [Doc. #23-7].)

      In addition, representatives from Hanesbrands attended monthly, and

sometimes weekly, production planning telephone calls along with representatives

of Hanes Caribe and GMC. (Decl. of Javier Chacon ¶¶ 25, 26.)  During the calls,

Hanesbrands employees would communicate their production decisions to Hanes

Caribe and GMC. (Id. ¶ 25.)  In addition, Hanesbrands would send GMC production

information on a regular basis through ApparelNet, an electronic system residing on

a server in Winston-Salem and managed by Hanesbrands that GMC used to

manage and control its production. (Id.)  GMC accessed ApparelNet to transmit

shipping documents and invoices to Hanes Caribe and Hanesbrands. (Id. ¶ 26.)

      According to Chacon,

13

While GMC representatives have coordinated with individuals from Hanes Caribe in the Dominican Republic . . . to execute Hanesbrands' decisions about the relationship, . . . the relationship with GMC was largely based in North Carolina and largely managed through Hanesbrands' employees working in its Winston-Salem, North Carolina offices in conjunction with Hanes Caribe.

(Id. ¶ 22.)

In further support, Chacon asserts that GMC representatives indicated "their understanding that the decisions about the relationship are made in Winston-Salem, which is why GMC has regularly requested and participated in telephone calls and face-to-face meetings with those decision-makers . . . in Winston-Salem." (Id. ¶ 13; see also id. ¶ 17 (stating similar assertion).)  More specifically, according to Chacon, "multiple times over the course of the parties' long-term business relationship, GMC reached out to Hanesbrands, or its predecessors . . . in Winston-Salem, North Carolina to request continuations and expansions of the parties' relationship." (Id. ¶ 15.)

Attached to Hanes Caribe's response in opposition to GMC's Motion to Dismiss and to Chacon's declaration are various communications between GMC and Hanesbrands, some originating from GMC and others originating from Hanesbrands.  These consist of an email from Clifford Apaid of Apparel and Garment Contractors[12] to Ricardo Koo of an unidentified entity on October 11, 2007 concerning production issues [Doc. #23-2], an email from Kim Myers of

---

[12] From 1996 to 2007, Apparel and Garment Contractors was GMC's "forerunner". (Decl. André Apaid ¶ 8.)

14

Hanesbrands to André Apaid of GMC and his response on December 2, 2008 about Hanesbrands' interest in GMC's potential additional capacity for 2009 [Doc. #23-3], a letter from Kim McAleer of Hanesbrands to André Apaid on June 28, 2011 to communicate the findings of an audit that Hanesbrands performed at GMC [Doc. #23-7], a letter from André Apaid to Mike Faircloth of Hanesbrands on March 13, 2014 about GMC employee pay and work volumes [Doc. #23-4, Doc. #24-2], an email from André Apaid to Gerald Evans, Mike Faircloth, Javier Chacon, and Ricardo Perez on May 11, 2015 attempting to prevent or delay the termination of the relationship [Doc. #24-3], email communications between André Apaid and Mike Faircloth on May 19, 2015 to arrange a meeting [Doc. #23-8], email communications between André Apaid and Mike Faircloth on July 31, 2015 and August 2, 2015 regarding a drop in volume, an invoice for payment, and a request for a $3.9 million loan [Doc. #23-5], an email from Javier Chacon to André Apaid and Clifford Apaid and André Apaid's response on August 6, 2015 concerning the Wind Down Agreement [Doc. #23-9], email communications between André Apaid, Mike Faircloth, and Javier Chacon on August 6 and 7, 2015 about the Wind Down Agreement [Doc. 23-1], email communications between André Apaid and Mike Faircloth on September 2 and 3, 2015 concerning payment disputes [Doc. #23-6], email communications between André Apaid and Mike Faircloth in October 2015 about wind-down concessions and GMC's claim of undercompensation [Doc. #24-4], and email communications between Mike Faircloth and André Apaid on October 26 and 27, 2015 to arrange a meeting to discuss the winding down of

15

business [Doc. #23-10].  In eight of these emails, Apaid made himself available for in-person meetings in North Carolina.

These communications reveal GMC's familiarity with Hanesbrands such that Apaid's communications with Hanesbrands representatives noted above repeatedly refer to Hanesbrands ("Hbi", "HBI", "HBi") and never refer to Hanes Caribe.  For example, Apaid makes the following statements to Hanesbrands representatives:

- "I and my staff have always strived for 21 years so that Hbi would look at the Apaid family in Haiti as a trusting partner[.]" [Doc. #23-1];

- "You can understand the possible implication of such a layoff as the Mandate is implemented in HBI's dedicated facility." [Doc. #23-4];

- "I am asking Hbi to loan to GMC 3.9 Million dollars that will be deducted progressively as deliveries on the new program is done." [Doc. #23-5];

- "I am also sorry that you have not found it constructive to afford me one last meeting requested in the name of my 21 year[s] of service with as many as 3,000 employees hired to service Hbi." [Doc. #23-6];

- "It is with disappointment that our family has seen Hbi's management position profile itself to possibly stop working with the Apaid group in Haiti after a 21 year relationship with Hanes." [Doc. #24-3]; and

- "[W]e believe it is important that Hbi maintain jobs in Port-au-Prince and in Haiti." [Doc. #24-3].

Chacon asserts that, in addition to GMC's communications with Hanesbrands representatives, "[i]n the last few years alone," GMC representatives

16

made at least six visits to Hanesbrands' Winston-Salem headquarters and that the frequency and nature of these visits are representative of the frequency and nature of GMC's visits over the entire course of the relationship. (Id. ¶¶ 18, 19.) GMC representatives visited Hanesbrands in June 2011 to discuss a performance improvement plan, in August 2013 to review GMC's mid-year performance, in March 2014 to discuss the future of the parties' relationship, in October 2014 to negotiate an exit agreement at which time Apaid "pitched" to Hanesbrands "a proposal to build a new sewing facility to which he could transfer all the product sewn by GMC for Hanesbrands," in June 2015 to negotiate the terms of the agreement to wind-down GMC's operations, and in November 2015 to discuss the terms of the wind-down agreement. (Id. ¶¶ 18.a. – 18.f.)

### III.

Initially, Hanes Caribe argues that GMC has waived its personal jurisdiction arguments by failing to submit any facts in support of its motion and failing to dispute that it has minimum contacts with North Carolina. (See Pl.'s Resp. to Def.'s Mot. to Dismiss at 9-10 [Doc. #23].) Hanes Caribe cites Rules 7(b)(1), 12(b), and 12(h)(1) of the Federal Rules of Civil Procedure, along with Goodman v. 1973 25 Foot Trojan Vessel, 859 F.2d 71, 74 (8th 1988), and Alonso v. Agrigenetics, Inc., No. B-04-005, 2005 WL 8131247 (S.D. Tx. Mar. 8, 2005), in support of its argument. (Id. at 9, 10.)

Pursuant to Rule 12(h)(1), a party waives, among other defenses, lack of personal jurisdiction if it fails to make a motion under Rule 12 before pleading if a

17

responsive pleading is allowed. Fed. R. Civ. P. 12(b), 12(h)(1). Rule 7(b)(1)

requires that a motion, among other things, "state with particularity the grounds

for seeking the order[.]" Fed. R. Civ. P. 7(b)(1). The Eighth Circuit in Goodman

cited Rule 7(b)(1) when it affirmed the district court's denial of the defendant's

motion to dismiss for lack of personal jurisdiction. 859 F.2d at 74. The court

found that the defendant waived any objection to personal jurisdiction when he

"failed to indicate the grounds for his jurisdictional challenge or to provide the

court with facts that would be relevant in determining whether in personam

jurisdiction was lacking." Id. The court explained that the "particularity

requirement protects district courts from being subject to reversal for rulings on

which they did not have the benefit of argument from opposing side and ensures

that opposing parties will have notice of their opponents' contentions." Id.; see

also 2 Jeffrey A. Parness, Moore's Federal Practice § 7.03[4][a] (noting that the

"particularity requirement gives notice to the court and the opposing party,

providing the opposing party the opportunity to respond and providing the court

with enough information to process the motion correctly"). In evaluating the

particularity of a motion, "[a] court may consider other closely filed documents[.]"

Parness at § 7.03[4][b]. "In the absence of a showing of prejudice, the substance

of a motion rather than its form will usually be considered." Id. § 7.03[4][a] (noting

that the particularity requirement is a flexible one).

      Here, Hanes Caribe alleges that this Court has personal jurisdiction over

GMC because "GMC is engaged in substantial activity in North Carolina by doing

business with Hanes Caribe, which is a wholly-owned subsidiary of Hanesbrands Inc. . . . , related to the underlying agreements and dispute between the parties. Hanesbrands Inc. has its principal place of business in Winston-Salem, North Carolina." Understandably, GMC interpreted this allegation to rest on the parent-subsidiary relationship of Winston-Salem, North Carolina-based Hanesbrands Inc. and Cayman Island-based Hanes Caribe. Under these circumstances, GMC moved to dismiss for lack of personal jurisdiction because "the location of Hanes Caribe's parent corporation does not confer jurisdiction over GMC in this Court." GMC supported its motion with a brief in which the sole question as to personal jurisdiction was whether, as a matter of law, this Court has personal jurisdiction based on the allegation that Hanes Caribe's parent corporation's principal office is in North Carolina. (Br. in Supp. of Def.'s Mot. for Dismissal Pursuant to Fed. R. Civ. P. 12(b)(2) & 12(b)(3), or Alternatively, for Dismissal or Stay Pursuant to the "First-Filed Action" Doctrine at 3 [Doc. #18].)

While it would have been preferable for GMC to have averred prior to its reply brief that the Court has no other basis on which to exercise personal jurisdiction over it, GMC's motion and supporting brief were particular enough to put Hanes Caribe on notice that it would need to show that this Court has personal jurisdiction over GMC either based on the parent-subsidiary relationship or some other reason. In response to GMC's Motion to Dismiss, Hanes Caribe proffered declarations and supporting exhibits in support of its argument that this Court has specific jurisdiction over GMC based on reasons other than the parent-subsidiary

19

basis.  Furthermore, although GMC attached the declaration of André M. Apaid to its Reply Brief in Support of its Motion to Dismiss, Hanes Caribe did not move the Court for an opportunity to file a sur-reply to respond to Apaid's declaration. Hanes Caribe has not argued, nor is there evidence, that it was prejudiced by the substance of GMC's motion.  Therefore, it is determined that GMC did not waive its personal jurisdiction defense.

IV.

A.

When a defendant asserts a Rule 12(b)(2) challenge to a court's personal jurisdiction, the question is one for the court and the plaintiff bears the burden to prove the existence of a ground for personal jurisdiction. Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989).  The burden "varies according to the posture of a case and the evidence that has been presented to the court." Grayson v. Anderson, 816 F.3d 262, 268 (4th Cir. 2016).  Ultimately, a plaintiff must prove the existence of a ground for jurisdiction by a preponderance of the evidence. Id. (citing Combs, 886 F.2d at 676).  However, when, as here, the court addresses the question of personal jurisdiction on the basis of the motion papers, supporting legal memoranda, relevant allegations of the complaint, and supporting affidavits,[13] the plaintiff has the burden of making a prima facie showing in support of

---

[13] "[A] court has broad discretion to determine the procedure that it will follow in resolving a Rule 12(b)(2) motion." Grayson, 816 F.3d at 268.

jurisdiction. Id. (citing Combs, 886 F.2d at 676); Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014).

A plaintiff makes a prima facie showing in this context when it "present[s] evidence sufficient to defeat a motion for judgment as a matter of law." In re Polyester Staple Antitrust Litig., No. 3:03CV1516, 2008 WL 906331, at *7 (quoting Reese Bros., Inc. v. U.S. Postal Serv., 477 F. Supp. 2d 31, 36 (D.D.C. 2007)); see also Mattel, Inc. v. Greiner & Hausser GmbH, 354 F.3d 857, 862 (9th Cir. 2003) cited in Universal Leather, 773 F.3d at 561 (stating that a plaintiff makes a prima facie showing of personal jurisdiction by presenting facts that, if true, would support jurisdiction).  Stated another way, a plaintiff makes a prima facie showing when there is evidence which a reasoning mind could accept as sufficient to support the proposition in question.

Absent an evidentiary hearing, the court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs, 886 F.2d at 676; see also Universal Leather, 773 F.3d at 560 (requiring the court to assume the plaintiff's version of the facts is credible and to construe any conflicting facts in the affidavits in the light most favorable to the plaintiff).  However, "[t]he allegations of the complaint are taken as true only if they are not controverted by evidence from the defendant." Vision Motor Cars, Inc. v. Valor Motor Co., 981 F. Supp. 2d 464, 468 (M.D.N.C. 2013) (citing Wolf v. Richmond Cty. Hosp. Auth., 745 F.2d 904, 908 (4th Cir. 1984)).  When a defendant presents evidence that

21

the court lacks personal jurisdiction, the plaintiff must present affidavits or other evidence to the contrary. Id. (citing Clark v. Remark, 993 F.2d 228 (Table), 1993 WL 134616, *2 (4th Cir. Apr. 29, 1993)). If both sides present evidence about personal jurisdiction, the court must resolve factual conflicts in the plaintiff's favor "for the limited purpose" of determining if the plaintiff has made a prima facie showing. Id. (citing Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 62 (4th Cir. 1993)).

A federal court may exercise personal jurisdiction over a non-resident defendant only if the forum state's long-arm statute authorizes the exercise of jurisdiction and the exercise of jurisdiction comports with the Fourteenth Amendment due process requirements. Christian Sci. Bd. of Dirs. of First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). North Carolina's long-arm statute, General Statute § 1-75.4, "is designed to extend jurisdiction over nonresident defendants to the fullest limits permitted by the Fourteenth Amendment's due-process clause." Church v. Carter, 94 N.C. App. 286, 290, 380 S.E.2d 167, 169 (1989); see also Christian Sci. Bd. of Dirs., 259 F.3d at 215 (stating same). Thus, the court's focus becomes whether the plaintiff has made a prima facie showing that the defendant's contacts with North Carolina satisfy constitutional due process. Universal Leather, 773 F.3d at 558-59.

## B.

Due process allows a court to exercise specific or general jurisdiction over a defendant. Hanes Caribe only asserts that there is specific jurisdiction over GMC.

22

(Pl.'s Resp. to Def.'s Mot. to Dismiss at 11, 11 n.11 (providing the requirements for specific jurisdiction and noting that "[g]eneral jurisdiction is not at issue in this case"). Specific jurisdiction exists when the forum state exercises personal jurisdiction over the defendant "in a suit arising out of or related to the defendant's contacts with the forum[.]" Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984).

To exercise specific jurisdiction over a defendant, due process requires that the court examine "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009) (quoting ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002)).

The inquiry into "purposeful availment . . . is grounded on the traditional due process concept of 'minimum contacts[.]'" Universal Leather, 773 F.3d at 559. "Jurisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)). It is not enough that a defendant's contacts with the forum state arise because the plaintiff is located there. See Worldwide Ins. Network, Inc. v. Trustway Ins. Agencies, LLC, No. 1:04CV906, 2006 WL 288422, at *5 (M.D.N.C. Feb. 6, 2006). Instead, the defendant needs

23

to have "purposely directed [its] activities at the state of North Carolina." See id.

At its heart, the question is "whether the defendant's conduct and connection with

the forum [s]tate are such that he should reasonably anticipate being haled into

court there." Universal Leather, LLC, 773 F.3d at 559 (citation omitted) (alteration

in original).

In the business context, courts analyze "various nonexclusive factors" to

determine if a defendant has purposefully availed itself of the privilege of

conducting activities in the state, including, but not limited to:

- whether the defendant maintains offices or agents in the forum state,
- whether the defendant owns property in the forum state,
- whether the defendant reached into the forum state to solicit or initiate business,
- whether the defendant deliberately engaged in significant or long-term business activities in the forum state,
- whether the parties contractually agreed that the law of the forum state would govern disputes,
- whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship,
- the nature, quality and extent of the parties' communications about the business being transacted, [and]
- whether the performance of contractual duties was to occur within the forum[.]

Consulting Eng'rs Corp., 561 F.3d at 278 (citations omitted).  Although several of

these factors involve the physical presence of a defendant in a forum state, "[s]o

long as a commercial actor's efforts are 'purposefully directed' toward residents of

another State, [the Supreme Court has] consistently rejected the notion that an

absence of physical contacts can defeat personal jurisdiction there." Burger King

Corp., 471 U.S. at 475.  On the other hand, "the Fourth Circuit has given great

weight to the question of who initiated the contact between the parties." Pan-Am. Prods. & Holdings, LLC v. R.T.G. Furniture Corp., 825 F. Supp. 2d 664, 682 (M.D.N.C. 2011); see also Universal Leather, LLC, 773 F.3d at 562 (noting that "the fact that a defendant initiated contact with the plaintiff in the forum state and repeatedly reached into the forum state to transact business during in-person visits there" "significantly" impacted the personal jurisdiction analysis) (internal quotations omitted).

For example, a resident's contract with a non-resident defendant is not by itself sufficient to establish sufficient minimum contacts with the forum state. Burger King Corp., 471 U.S. at 478. Because the contract is "but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction[,]" a court must evaluate "prior negotiations[,] contemplated future consequences, . . . the terms of the contract[,] and the parties' actual course of dealing[.]" Id. at 479.

However, in a breach of contract case, only the "dealings between the parties in regard to the disputed contract" are relevant to the minimum contacts analysis. Vetrotex CertainTeed Corp. v. Consolidated Fiber Glass Prods. Co., 75 F.3d 147, 153 (3d Cir. 1996) cited in CEM Corp. v. Personal Chemistry, AB, 55 F. App'x 621, 625 (4th Cir. 2003) (unpublished). For example, in CEM Corp., the action was for breach of an agreement-in-principle to settle a patent infringement suit. 55 F. App'x at 625. The court explained that only the contacts related to the settlement agreement, not those involving the sale or advertising of an allegedly

25

infringing product, could be the basis for specific jurisdiction in that case. Id. Furthermore, additional contacts cannot be aggregated when evaluating the existence of specific jurisdiction unless "past contacts involving the forum state should either bear on the substantive legal dispute between the parties or inform the court regarding the economic substance of the contract." RAR, Inc. v. Turner Diesel, Ltd., 107 F.3d 1272, 1278 (7th Cir. 1997) cited in CEM Corp., 55 F. App'x at 625; see also Hanes Cos., Inc. v. Contractor's Source, Inc., No. 1:08CV334, 2008 WL 4533989, *6 (M.D.N.C. Oct. 6, 2008) ("Even prior dealings between parties to the suit are not to be considered in a specific jurisdiction analysis."), adopted Dec. 15, 2008.

The Fourth Circuit has "generally . . . concluded that a foreign corporation has purposefully availed itself of the privilege of conducting business in the forum state when the defendant 'substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute.'" Universal Leather, LLC, 773 F.3d at 560 (quoting Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 302 (4th Cir. 2012)).  On the other hand, the Fourth Circuit has "typically . . . found such purposeful availment lacking in cases in which 'the locus of the parties' interaction was overwhelmingly abroad.'" Id. (quoting Tire Eng'g & Distrib., LLC, 682 F.3d at 302).

Only after the plaintiff makes a prima facie showing of purposeful availment does the court need to evaluate the two remaining prongs of the jurisdictional analysis: whether the defendant's contacts with the forum state form the basis of

26

the suit and whether other considerations confirm the appropriateness of the forum such as the burden on the defendant, the interest of the forum state in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the shared interests in obtaining efficient resolution, and the interests of the states in furthering substantive social policies. Consulting Eng'rs, 561 F.3d 278-79.

## C.

After a careful review of the materials before the Court, it is determined that Hanes Caribe has failed to make a prima facie showing that GMC purposefully availed itself of the privilege of conducting activities in North Carolina such that it should reasonably have anticipated being haled into court here. Much of Hanes Caribe's argument and supporting evidence refers to the parties' long-term business relationship, rather than focusing on the contacts related to the issue before the Court. The underlying action is one in which Hanes Caribe seeks a declaratory judgment that the arbitration clause of the 2008 Agreement is valid and an injunction prohibiting GMC from pursuing the Haitian action in violation of the arbitration clause. While the parties, including their predecessors, have seemingly done business for decades, there is no suggestion that the previous business dealings and contracts between the parties bear on the validity of the arbitration clause at issue. Therefore, because Hanes Caribe argues that this Court has specific jurisdiction over GMC, only the dealings between Hanes Caribe and GMC as to the 2008 Agreement are relevant to the minimum contacts analysis here. See CEM Corp., 55 F. App'x at 625; RAR, Inc., 107 F.3d at 1278.

27

The sole factor that likely weighs in favor of the exercise of personal jurisdiction over GMC is its in-person contact with Hanesbrands, a resident of North Carolina, in North Carolina regarding the business relationship. According to Chacon, GMC representatives visited with executives of Hanesbrands in North Carolina on at least six occasions since June 2011. GMC representatives visited Hanesbrands in June 2011 to discuss a performance improvement plan and in August 2013 to review GMC's mid-year performance. The remaining four visits, as well as Apaid's willingness to meet with Hanesbrands executives in North Carolina, occurred after the Agreement's expiration and concerned the future of the parties' relationship. Although limited in number, these in-person visits to North Carolina to discuss GMC's performance presumably under the 2008 Agreement do weigh in favor of jurisdiction over GMC.

However, the remainder of the factors weigh against the exercise of personal jurisdictional over GMC. Most obviously, GMC presented uncontroverted evidence that it has no offices or agents in North Carolina and owns no property in the state. While the analysis of the other factors may not be as obvious, in context, they also do not support the exercise of jurisdiction.

Hanes Caribe has not alleged in the Complaint and neither party has presented evidence as to which party initiated contact for the 2008 Agreement, the factor to which the Fourth Circuit affords great weight. See Pan-Am. Prods. & Holdings, LLC, 825 F. Supp. 2d at 682 ("[T]he [Complaint] is significant for what it does not say. [The plaintiff] has not alleged that . . . Defendants, or their agents,

28

initiated contact with [the plaintiff] regarding the [2008 Agreement], despite this fact being within the direct knowledge of [the plaintiff].").  The only evidence somewhat related is Apaid's assertion that, in the 1990's, Hanes Dominican executives contacted his wife and him in the Dominican Republic and asked them to start manufacturing operations in Haiti exclusively for Hanes Dominican.  While this is strong evidence that Apaid did not reach into North Carolina to initiate the business relationship with Hanes Dominican, it is also not evidence specific to the 2008 Agreement.  Also insufficient is Apaid's pitching a business proposal about building a new sewing facility to Hanesbrands when visiting Winston-Salem in October 2014.  The initiation of that proposed business relationship with Hanesbrands was clearly not the initiation of the 2008 Agreement between Hanes Caribe and GMC.  Because there is no evidence that GMC did or did not reach into North Carolina to solicit or initiate the business for the 2008 Agreement, this factor does not provide clarity as to personal jurisdiction over GMC.

In contrast to the lack of evidence that GMC reached into North Carolina to initiate the 2008 Agreement, Hanes Caribe has submitted detailed support for its argument that GMC deliberately engaged in significant or long-term business activities in North Carolina when carrying out its obligations under the 2008 Agreement.  Initially, Chacon's generalized statement that GMC manufactured tens of millions of units of t-shirts worth hundreds of millions of dollars over the course of the parties' long-term relationship conflates GMC's performance under the 2008 Agreement with its performance under other agreements not before the Court.

29

Similarly, Basden's assertion that GMC shipped goods to North Carolina before 2007 reflects conduct prior to the execution of the 2008 Agreement. However, Hanes Caribe did attach invoices to Chacon's declaration that would have been issued during the existence of the 2008 Agreement.[14]  These invoices from 2007 through 2013 show that over 200,000 t-shirts manufactured by GMC were destined for Hanesbrands' facilities in North Carolina. Specifically, the August 2013 invoice reflects that GMC was the shipper of those t-shirts. In addition to these invoices, according to Bullings and spreadsheets attached to her declaration, GMC shipped approximately 72 million units to Hanesbrands in North Carolina over the course of the 2008 Agreement. On their face, these figures weigh in favor of the exercise of jurisdiction over GMC. See, e.g., Hanes Cos., Inc. v. Galvin Bros., Inc., No. 1:09CV918, 2013 WL 594013, *10 (M.D.N.C. Feb. 15, 2013), adopted Mar. 11, 2013 (noting "[t]he size of the contract is relevant in determining whether [an out-of-state defendant's] actions directed toward [the plaintiff's home-state] were sufficient to establish personal jurisdiction" and finding this factor favored jurisdiction where the contract's value was approximately $2,000,000 and required numerous shipments over a period of months) (alterations in original). However, from the context of the 2008 Agreement – which Hanes Caribe attached

---

[14] Hanes Caribe attached thirteen invoices to Chacon's declaration. Four of those invoices, though, were for products manufactured prior to the execution of the 2008 Agreement, and two were for products manufactured after its expiration. Those invoices are not relevant to the specific jurisdiction analysis required of the Court. See CEM Corp., 55 F. App'x 621; RAR, Inc., 107 F.3d 1272; Vetrotex CertainTeed Corp., 75 F.3d 147.

to the Complaint and upon which it relies in its brief in opposition to GMC's Motion to Dismiss, comes a slightly, but substantively, different explanation of GMC's contractual performance.

According to the 2008 Agreement, Hanes Dominican arranged to have shipped to GMC the parts necessary for the manufacture of goods as required by Hanes Dominican. Thereafter, GMC's obligations to Hanes Dominican included assembling at its Haitian facility conforming products, advising in writing of the receipt of parts and finished product shipments, invoicing Hanes Dominican with a conforming invoice, and responding to requests in connection with Hanes Dominican's efforts to export and secure favorable tariff and quota treatment. GMC also had to inspect each shipment before it left GMC's Haitian premises and ensure each shipment's security from the time the product left GMC's premises until it was loaded onto the final outbound transporting carrier. Hanes Dominican was obligated to choose the export location within the United States, designate the carrier, pay for the product to be shipped from GMC's facility to the export location, and insure the goods from United States territorial waters through GMC's facility. Therefore, the terms of the 2008 Agreement itself reveal that the millions of units that GMC shipped to North Carolina, a fact assumed to be true for purposes of Hanes Caribe's prima facie showing of personal jurisdiction, were shipped to North Carolina at the direction of Hanes Dominican. Ultimately, neither the volume or value of shipments from GMC to North Carolina supports the exercise of personal jurisdiction.

31

For similar reasons, the place of performance of the parties' contractual duties does not support personal jurisdiction. As explained above, GMC manufactured product in and shipped product from its Haitian facility. It is less clear precisely where Hanes Dominican or Hanes Caribe performed its obligations. On one hand, it provided GMC the parts for manufacture, specified the guidelines for manufacturing and invoicing, chose the export location and carrier, and insured the parts and product, performance that likely took place from its corporate offices in the Cayman Islands. On the other hand, it also paid for shipment of GMC's product to North Carolina. Nevertheless, the facts do not suggest that much, if any, of either party's performance of its contractual duties was to be in North Carolina.

Furthermore, the passing references to Hanesbrands in the Agreement do not change the analysis. GMC merely agreed to abide by various policies of, not infringe on any intellectual property rights of, and provide reports to the parent company of the contracting party, Hanes Dominican. The inclusion of a Winston-Salem, North Carolina address for notices to Hanesbrands' Law Department is also of little support for jurisdiction.

In addition, Hanes Caribe's argument and evidence that all major decisions for the parties' relationship were made in Hanesbrands' corporate offices in North Carolina do not support a finding that GMC deliberately engaged in significant or long-term business activities in North Carolina. The 2008 Agreement was between two parties – GMC, a Haitian company, and Hanes Dominican, a Cayman

32

corporation.  Hanes Caribe, the assignee, is also a Cayman corporation.  GMC did

not contract with Hanesbrands for the performance of the 2008 Agreement, and,

according to the only evidence before the Court on the matter, GMC has never

contracted with Hanesbrands.  The fact that Hanesbrands, a non-party to the

contract and the parent corporation of Hanes Dominican and Hanes Caribe which

has its principal place of business in North Carolina, made and approved the major

decisions related to the 2008 Agreement and conducted an audit of GMC's Haitian

facility cannot subject GMC to personal jurisdiction in North Carolina. See Burger

King Corp., 471 U.S. at 474 ("The unilateral activity of those who claim some

relationship with a nonresident defendant cannot satisfy the requirement of contact

with the forum State.") (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).

This is not even a case where a plaintiff's performance of duties in the forum state

is considered insufficient to confer jurisdiction over a foreign defendant. See

Sloane v. Laliberte, No. 1:08CV381, 2011 WL 2938117 (M.D.N.C. July 19, 2011)

(finding that the plaintiffs' partial performance of work within North Carolina did

not warrant the exercise of personal jurisdiction when the defendant's performance

occurred in Canada and the plaintiffs directed activities into Canada), adopted

(M.D.N.C. Sept. 15, 2011).  Here, the plaintiff is a Cayman corporation for whom

the place of performance per the 2008 Agreement is not even identifiable as North

Carolina.  Instead, Hanes Caribe focuses on the performance in North Carolina of

its parent corporation, an entity not even a party to the Agreement.

Next, Hanes Caribe has submitted the invoices previously described, emails, and a letter and has explained telephone calls and the use of ApparelNet, in support of its argument that the parties' communications support the exercise of personal jurisdiction. "[T]he mere fact that emails, telephone calls, and faxes were employed does not, of itself, alter the minimum contacts analysis. The analysis must focus on the nature, quality, and quantity of the contacts, as well as their relation to the forum state." Consulting Eng'rs Corp., 561 F.3d at 279 n.5. To be sure, all of the communications show Apaid's personal and professional familiarity with Hanesbrands, as he refers to Hanesbrands in nearly every communication and, with the exception of the invoices, never refers to Hanes Dominican or Hanes Caribe. While such familiarity with Hanesbrands suggests that this factor weighs in favor of the exercise of jurisdiction, the overall nature, quality, and quantity of the communications ultimately do not.

Aside from the invoices already discussed, the only written communication to have originated from GMC during the existence of the 2008 Agreement is the October 2007 email from Clifford Apaid concerning production issues. The October 2008 email is from Hanesbrands inquiring about GMC's additional capacity for 2009, and the June 2011 letter is from Hanesbrands providing the findings of the audit that it conducted at GMC's facility. Perhaps the September 2015 and communications about payment disputes could relate to outstanding obligations under the 2008 Agreement. However, the remainder of the written communications involve business dealings after the expiration of the 2008

34

Agreement – a new agreement on employee pay, concern about work volume, and a wind down agreement.

The telephone calls do little to provide any further support for jurisdiction. Although Chacon states that Apaid communicated extensively in 2014 by telephone (and email), those communications would have taken place after the expiration of the 2008 Agreement. As for the frequent, recurring telephone calls that took place while the 2008 Agreement was in effect, Hanesbrands attended those meetings and distributed information to GMC, as opposed to GMC initiating those calls and communicating its production capacity to Hanesbrands. Likewise, although ApparelNet resides on a server in North Carolina where Hanesbrands manages it, Hanesbrands used it to communicate production needs to GMC after which GMC accessed the program to create shipping and invoicing documents that it transmitted to Hanes Caribe and Hanesbrands. Ultimately, especially considering that the negotiations for the 2008 Agreement did not take place in North Carolina, the nature, quality, and quantity of the communications between Hanes Caribe and GMC do not support the exercise of jurisdiction.

Finally, there is the choice of North Carolina law in the 2008 Agreement. Although the parties' agreement that the law of forum state will govern disputes is alone insufficient to confer jurisdiction, when combined with the business relationship, "it [can] reinforce[] [the defendant's] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there." Burger King Corp., 471 U.S. at 482. However, this is not the case here. As explained

above, GMC has not deliberately affiliated with North Carolina such that it would have reasonably foreseen litigation here over a dispute arising from the 2008 Agreement.  Furthermore, even though North Carolina law was to govern the Agreement, all disputes arising out of or in connection with the Agreement were to be settled in arbitration in Miami, Florida.

In sum, this Court does not have personal jurisdiction over GMC.  The contract at issue – the 2008 Agreement – is between GMC, a Haitian company, and Hanes Dominican, a Cayman Island company (and subsequently, Hanes Caribe, also a Cayman Island company) and has no substantial connection to North Carolina.  The evidence before the Court of specific jurisdiction does not support a finding that GMC purposefully availed itself of the privilege of doing business in North Carolina such that it should reasonably have anticipated being haled into court here.  Because Hanes Caribe has failed to make a prima facie showing of purposeful availment, the remaining prongs of the specific jurisdiction analysis will not be analyzed.

V.

Hanes Caribe has moved for limited jurisdictional discovery if the Court were inclined to find that Hanes Caribe did not make a prima facie showing of specific personal jurisdiction.  "District courts have broad discretion in [their] resolution of discovery problems that arise in cases pending before [them]." Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 402 (4th Cir. 2003).  Hanes Caribe seeks discovery on the following topics: (1) contacts with and visits to

36

North Carolina by GMC related to its relationship with Hanes Caribe, Hanesbrands, and their predecessors, (2) communications, including contract negotiations, between Hanes Caribe, Hanesbrands, GMC, and their predecessors, and (3) execution and performance of contracts between these entities including the location where any agreements were entered into, the size of the shipments from GMC to North Carolina, and the invoicing and payments therefore. (Mot. for Discovery at 2-3.)  However, because Hanes Caribe only argues that this Court has specific jurisdiction over GMC and the information that it seeks from discovery is within its own knowledge, there is no reason to believe that jurisdictional discovery will change the outcome of the Court's decision.  Therefore, Hanes Caribe's Motion for Discovery is denied.

## VI.

Having determined that this Court lacks personal jurisdiction over GMC, Hanes Caribe's Motion for Preliminary Injunction and Hanes Caribe's Emergency Motion are denied.

## VII.

For the reasons stated herein, IT IS HEREBY ORDERED that Defendant's Motion for Dismissal Pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3), or Alternatively, for Dismissal or Stay Pursuant to the "First-Filed Action" Doctrine [Doc. #17] is GRANTED in so far as this Court lacks personal jurisdiction over Defendant; Plaintiff's Alternative Motion for Expedited, Limited Discovery Regarding Personal Jurisdiction [Doc. #27] is DENIED; Plaintiff's Motion for

37

Preliminary Injunction Barring Defendant from Pursuing Haitian Proceeding in Contravention of Arbitration Agreement [Doc. #3] is DENIED for lack of personal jurisdiction over Defendant; Plaintiff's Emergency Motion to Expedite Hearing and Decision on Pending Motions [Doc. #36] is DENIED in part in so far as this Court lacks personal jurisdiction over Defendant and in part as moot; and that this case is DISMISSED.

This the 1st day of June, 2016.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge